839 So.2d 1170 (2003)
UNION OIL COMPANY OF CALIFORNIA
v.
CHEYENNE OIL PROPERTIES, INC.
No. 02-1330.
Court of Appeal of Louisiana, Third Circuit.
March 5, 2003.
*1171 Susie Morgan, M. Allyn Stroud, Wiener, Weiss & Madison, Shreveport, LA, for Defendant/Appellant, IP Petroleum Co., Inc.
R. Thomas Jorden, Jr., Ted M. Anthony, Perret, Doise, A P.L.C., Lafayette, LA, for Plaintiff/Appellee, Union Oil Company of California.
Court composed of JIMMIE C. PETERS, MARC T. AMY, and MICHAEL G. SULLIVAN, Judges.
PETERS, J.
This litigation began as a suit by Union Oil Company of California (Unocal) against Cheyenne Oil Properties, Inc. (Cheyenne Oil) to recover from Cheyenne Oil its share of expenses for work performed on the lease arising from its working interest ownership in an offshore oil and gas lease. Unocal later named IP Petroleum Company (IP) as a party defendant, seeking to recover the same expenses from it. The matter is before us on IP's appeal of a summary judgment rendered by the trial court in Unocal's favor and against IP, awarding Unocal the sum of $228,400.32 together with interest and attorney fees as damages. For the following reasons, we reverse the trial court's grant of the summary judgment and remand this matter for further proceedings.

DISCUSSION OF THE RECORD
At the center of this litigation is a March 1979 offshore oil and gas lease covering Block 44 of the Eugene Island area in the Gulf of Mexico (the lease) which was operated under the terms of a 1988 Joint Operating Agreement.[1] At the time of the execution of the Joint Operating Agreement, General Atlantic Resources, Inc. (General Atlantic) was the operator of the lease, and IP was one of the working interest owners and a party to the Joint Operating Agreement.
By early 1996, production on the lease had decreased to the point that UMC Petroleum Company (UMC), which had replaced General Atlantic as the lease operator, was recommending that plugging and abandonment activities begin. UMC circulated a letter dated February 13, 1996, advising the working interest owners of the cost of the plugging and abandonment work and seeking permission to proceed. Unocal, as a working interest owner, disagreed with this recommendation and formulated a plan to conduct downhole operations on an existing shut-in well on the lease in an effort to restore production and maintain the lease. Unocal proposed this alternative to the working interest owners of record by correspondence circulated on the same day as UMC's letter. Both UMC's letter and Unocal's letter were sent to IP as a working interest owner of record.
By the time the February 13 letters were circulated, IP had already participated in an auction wherein it purportedly transferred in December 1995 its 4.86473% working interest to Cheyenne Oil. The auction was facilitated by the Oil & Gas Asset Clearinghouse (Clearinghouse). Among the executed documents that the Clearinghouse required was a Qualified Bidder Registration form which was signed on December 13, 1995 by J.R. Sorrels, owner and president of Cheyenne Oil. In doing so, Mr. Sorrels asserted that Cheyenne Oil was qualified to participate in the transaction. Another document, titled "Buyer's Terms and Conditions of Purchase," also signed by Mr. Sorrels, contains the following language:
5. COMPLIANCE WITH AGREEMENTS AND REGULATIONS: Buyer *1172 must comply with and shall be bound by any and all leases, operating agreements, farmout agreements and other contracts, as well as all governmental laws and regulations to which the properties may be subject. In addition, prior to bidding on any property which may include the right to operate or involves governmental leases, Bidder must be qualified to assume such rights or hold such leases in accordance with applicable agreements and regulations. Buyer's failure to comply with all applicable agreements, jurisdictional agency requirements, government regulations and, if applicable, qualify thereunder to the satisfaction of Seller and The Clearinghouse shall result in Seller and The Clearinghouse having the right to nullify the sale. Should Buyer fail or refuse to meet these terms, or the terms of any agreements or regulations, Buyer agrees to forfeit the purchase price as liquidated damages and to re-assign and return the property to Seller free and clear of any encumbrances which were not in existence prior to Seller's conveyance of the property to Buyer.
Based on this purported sale of its interest, IP forwarded Unocal's February 13 correspondence to Cheyenne Oil on February 14, 1995.
Unocal became aware of IP's purported transfer of interest almost immediately after its February 13 letter. On February 20, 1996, Unocal circulated another letter to the working interest owners. This time, instead of sending it to IP, Unocal sent the letter to Cheyenne Oil. Unocal's February 20 letter reiterated the contents of its February 13 letter and sought the working interest owners' support for replacing UMC as operator. The letter provided a format for each working interest owner to vote in writing on the proposals. On February 22, 1996, Cheyenne Oil used the provided format to submit its vote in favor of Unocal's proposals. Additionally, Cheyenne Oil sent a facsimile message to UMC, informing UMC that it "elects not to abandone [sic] the Eugene Island Block 44 OCS-G3990 #4/4D well and proposes further operations to restore this lease back to production." By correspondence dated February 23, 1996, UMC informed the working interest owners of its resignation as operator of the lease and its support of Unocal as the successor operator.
Unocal began functioning as operator of the lease and, by correspondence dated March 4, 1996, requested that the working interest owners approve its proposed plan for the repair and restoration of production of the lease. A number of the working interest owners choose not to consent to bear their share of the cost of the proposed operations, and, pursuant to the terms of the Joint Operating Agreement, the remaining working interest owners were given the opportunity to increase their working interest ownership proportionally. By a letter dated March 6, 1996, Unocal informed Cheyenne Oil and three other working interest owners of that opportunity. Specifically, Cheyenne Oil was given the opportunity to increase its share of the working interest under the lease to 44.52214%. The letter requested that each working interest owner "respond by fax within twenty-four (24) hours from receipt of this letter as to whether or not you will elect to assume your proportionate share of the non-consent interest," and provided a form for each working interest owner to indicate the decision. The form, which was located at the end of the letter, stated:
[Name of the working interest owner]
Elects to acquire their proportionate interest as set forth above:___Yes___No
By:__________ Date:________
Cheyenne Oil returned the form on March 8, 1996, indicating that it did elect to increase *1173 its working interest ownership to 44.52214%.
Thereafter, because one of the remaining working interest owners chose not to acquire its proportionate share of the nonparticipating working interest, Cheyenne Oil was given an opportunity, by correspondence from Unocal dated March 19, 1996, to increase its share of the working interest ownership to 52.25544%. The letter contained the same type of decision form as was used in the March 4 correspondence. By use of the form, Cheyenne Oil informed Unocal on March 22, 1996, that it did not chose to further increase its working interest ownership.
Next in the chronology of events affecting the lease was the apparent unraveling of the transfer of interest from IP to Cheyenne Oil. Mr. Sorrels testified by deposition that, approximately three to four months after purchasing IP's interest through the Clearinghouse, his company was notified by the Clearinghouse that there were problems with the purchase. According to Mr. Sorrels, he was informed that, because Cheyenne Oil had not been pre-approved to participate as a working interest owner in a lease on the Outer Continental Shelf, the transfer from IP had been rejected and that he should return all paperwork to IP. Apparently, anyone seeking to acquire ownership in leases on the Outer Continental Shelf must be approved by the United States Mineral Management Service, and Cheyenne Oil had not been approved. By this time, according to Mr. Sorrels, Cheyenne Oil had already elected to participate in the workover activities and to increase its ownership interest in the lease. When Mr. Sorrels informed the Clearinghouse representative of the elections already made in pursuit of maintaining the lease, the representative stated that he "would get back with [Mr. Sorrels]." According to Mr. Sorrels, the representative never called again.
Unocal's attempt to regain production on the lease proved unsuccessful, and, during October and November of 1997, Unocal plugged and abandoned the remaining wells on the lease. When Cheyenne Oil failed to pay its pro rata share of the expenses associated with the workover and plugging and abandonment activities, Unocal instituted suit, naming only Cheyenne Oil as a defendant. Unocal's November 21, 2000 petition alleged that Cheyenne Oil had breached its contractual obligations under the Joint Operating Agreement and, as an alternative theory of recovery, that Cheyenne Oil had been unjustly enriched by Unocal's actions in functioning as operator of the lease. Unocal further alleged that, as a result, Cheyenne Oil owed $228,400.32, plus interest, costs, and attorney fees for workover and plugging and abandonment expenses.
In its answer to the petition, Cheyenne Oil admitted that it had agreed to participate in the workover operations and that it had not paid Unocal anything for that activity. However, citing the problems with its bid as related to it by the Clearinghouse, Cheyenne Oil asserted that it did not own a working interest in the lease and, therefore, was not subject to the terms and conditions of the Joint Operating Agreement. Additionally, Cheyenne Oil asserted that IP's working interest was never transferred to it.
Cheyenne Oil filed its answer on February 23, 2001, and, on March 13, 2001, Unocal amended its petition to name IP as a defendant. In doing so, Unocal asserted that, because Cheyenne Oil was denying ownership of the working interest, IP still owned the interest and was, therefore, liable to it for $228,400.32. Thus, Unocal's theory of recovery was based on Cheyenne Oil's denial of any working interest ownership. In its answer filed on May 7, 2001, IP asserted that Cheyenne Oil did own a working interest in the lease, that it had *1174 transferred its interest in the lease to Cheyenne Oil "for good and valid consideration," that it had no notice that the transfer was invalid, that it was never afforded the opportunity to consent to operations forming the basis of the litigation, and that Cheyenne Oil should be estopped from claiming that IP's transfer was invalid.
On August 21, 2001, Unocal filed the motion for summary judgment that is now before us. In its motion, Unocal did not mention its claim against Cheyenne Oil, but sought a judgment against IP only. Before a hearing could be held on the motion for summary judgment, IP filed a cross-claim against Cheyenne Oil, asserting that, in the event that it was held liable to Unocal for any amount, it was entitled to judgment against Cheyenne Oil for that amount. In the cross-claim, IP asserted a number of different theories of recovery, including the terms of the purported transfer of interest itself, contractual indemnity, intentional misrepresentation, negligent misrepresentation, and detrimental reliance or equitable estoppel.
After the April 8, 2002 hearing on Unocal's motion for summary judgment, the trial court granted the motion. In doing so, it stated no reasons for its judgment other than its conclusion that IP and Cheyenne Oil were solidarily liable to Unocal. At a later hearing, the trial court set the interest and attorney fees requested in the motion for summary judgment. The July 3, 2002 judgment signed by the trial court awarded judgment in favor of Unocal and against IP in the principal amount of $228,400.32, legal interest in the amount of $107,517.99 through the date of the judgment, future legal interest, and $50,000.00 in attorney fees. In its appeal, IP asserts three assignments of error.

OPINION
Motions for summary judgment are authorized by the Code of Civil Procedure, and "a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted." La.Code Civ.P. art. 966(C). Additionally,
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. Because the mover has the burden of establishing that no material factual issue exists, inferences to be drawn from the underlying facts contained in the materials before the court must be viewed in the light most favorable to the party opposing the motion. The party who defended against the motion for summary judgment must have his properly filed allegations taken as true and must receive the benefit of the doubt when his assertions conflict with those of the movant.

Schroeder v. Bd. of Supervisors of La. State Univ., 591 So.2d 342, 345 (La.1991) (citations omitted) (second emphasis added).
The Louisiana Mineral Code addresses the relationship between the lessor and lessee relative to assignments by the lessee.[2]See La.R.S. 31:126, et seq. However, it is silent concerning the effects *1175 flowing from the transfer of working interests by one working interest owner to other working interest owners. Because the Louisiana Mineral Code does not provide guidance on this issue, we must look to the Louisiana Civil Code for guidance. La.R.S. 31:2.
Louisiana Civil Code Article 1984 provides that "[r]ights and obligations arising from a contract are heritable and assignable unless the law, the terms of the contract or its nature preclude such effects." In the matter before us, the Joint Operating Agreement specifically recognizes that a party may assign its interest in the lease. Section 25.1 of the Joint Operating Agreement provides:
This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors, representatives and assigns and shall constitute a covenant running with the Lease(s). Each Party shall incorporate in any assignment of an interest in the Lease(s) a provision that such assignment is subject to this Agreement.
Unocal asserts before this court, as it did before the trial court, that La.Civ.Code art. 1821 provides the basis of liability on the part of IP. That Article provides as follows:
An obilgor and a third person may agree to an assumption by the latter of an obligation of the former. To be enforceable by the obligee against the third person, the agreement must be made in writing.
The obligee's consent to the agreement does not effect a release of the obligor.
The unreleased obligor remains solidarily bound with the third person.
In its first assignment of error, IP raises four arguments, the first being that La. Civ.Code art. 1821 does not support a finding of liability on its part because it is inapplicable to the fact situation presented. Basically, IP argues that, assuming for purposes of argument that the transfer of a working interest in an oil and gas lease creates an "obligation" under La.Civ. Code art. 1821, the Article would only apply to the obligations existing at the time of the transfer and not to those arising by virtue of the assignee's actions after the transfer. In the remaining three arguments under the first assignment of error, IP asserts that the terms of the Joint Operating Agreement do not support imposition of liability, that Unocal was in the best position to protect itself from the situation that arose, and that genuine issues of material fact exist concerning the percentage of working interest actually owned by Cheyenne Oil. In its second assignment of error, IP asserts that, assuming liability on its part, the trial court erred in awarding interest on the damage award given the fact that it did not receive copies of the invoices in question as required by the Joint Operating Agreement. Finally, in its third assignment of error, IP asserts that the trial court erred in awarding excessive attorney fees. We need not address these assignments of error directly because we conclude that the existence of genuine issues of material fact precludes the grant of a summary judgment in favor of Unocal and that the trial court erred in granting the motion.
Unocal's pleading which brought IP into the litigation raised unresolved genuine issues of material fact. In its supplemental and amending petition, Unocal reiterated the basis for its claim against Cheyenne Oil and added, as an "ALTERNATE THEORY OF RECOVERY," a claim against IP based on Cheyenne Oil's argument *1176 that IP's working interest was never transferred to Cheyenne Oil. In other words, the cause of action against IP was based on the assumption that IP still owned the working interest. Not only is this assumption not established by the record before us, but Unocal's argument to the court is that a transfer did not take place.
This contradiction presents a basic genuine issue of material fact. If Cheyenne Oil is IP's assignee, then IP may have obligations to Unocal regardless of whether it received notice pursuant to the Joint Operating Agreement. However, if Cheyenne Oil is not IP's assignee and IP still owns the working interest at issue, then there exists a genuine issue of material fact as to whether IP received the appropriate notices required by the Joint Operating Agreement. Thus, as the matter now stands, one cannot separate the issue of the working interest ownership from those issues now before us, as the resolution of that issue is fundamental to establishing the liability relationships between the litigants, specifically between Unocal and IP. Because we find that resolution of this factual issue is central to determining the remaining issues in this litigation, we conclude that the trial court erred in granting Unocal's motion for summary judgment.

DISPOSITION
We reverse the trial court's grant of summary judgment in favor of Union Oil Company of California and against IP Petroleum Company and remand this matter to the trial court for further proceedings. We tax all costs of this appeal to Union Oil Company of California.
REVERSED AND REMANDED.
NOTES
[1] Although executed by the parties at different times, the joint operating agreement had an effective date of September 1, 1988.
[2] We are aware that Section 22.1 of the Joint Operating Agreement provides that its terms should be "interpreted according to the laws of the State of Texas." However, the trial court applied Louisiana law and neither party to this appeal argues that anything other than Louisiana law should apply. Because we chose to reverse on the existence of disputed material facts, the language of Section 22.1 of the Joint Operating Agreement need not be addressed.